JUDGE HELLERSTEIN

14 CV 3873

RECEIVED

2014 MAY 28 P 9 21

U S DISTRICT COURT SDNY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- x

HO YU ("HOLLY") WU,                          :     Civil Action No.:
                                             :
                          Plaintiff,         :
                                             :     COMPLAINT
            v.                               :
                                             :
STARBUCKS CORPORATION,                       :
                                             :     Jury Trial Demanded
                          Defendant.         :
                                             :

--------------------------------------------------------------- x

RECEIVED
MAY 2 8 2014
U.S.D.C.S.D.N.Y.

Plaintiff Ho Yu ("Holly") Wu ("Plaintiff"), by and through her undersigned counsel,

Wigdor LLP, as and for her Complaint in this action against Defendant Starbucks Corporation

("Defendant," "Starbucks" or the "Company"), hereby alleges as follows:

## PRELIMINARY STATEMENT

1.      Though Starbucks holds itself out as a progressive company that values

employees' rights, the reality is that its employees are routinely discriminated against and

sexually harassed, only to then be discarded like one of its trademark cardboard cups when they

dutifully file protected complaints with management.  Ms. Wu, who immigrated to the United

States shortly before starting at Starbucks and hoped to work her way up in the Company, was

subjected to pervasive sexual harassment which included sexual comments and nicknames,

unwanted physical touching and being shown pornographic videos and pictures.  Though Ms.

Wu had been promoted, received multiple raises and was provided positive performance

evaluations during her tenure, she was callously fired, without notice, only three weeks after she

expressly complained in writing that she was being sexually harassed.

1

2.      Incredibly, and indicative of Starbucks' dismissive attitude towards its employees, Ms. Wu is unaware of any investigation Starbucks ever did into her complaints of sexual harassment.  Ms. Wu was never interviewed to discuss her allegations, nor did Starbucks follow up with Ms. Wu informally to discuss her sexual harassment complaint in any way.  Ms. Wu is also unaware of any interviews conducted of any of Ms. Wu's co-workers regarding her claims of sexual harassment.  In taking no remedial or investigative action, Starbucks violated its own internal harassment and discrimination policies, which expressly provide that:

> **When Starbucks is made aware of a situation that may violate this policy, an immediate, thorough and objective investigation will be undertaken.**

3.      Starbucks' only response to Ms. Wu's complaint came three weeks later, when Ms. Wu was suddenly fired, without warning or notice.

4.      This is far from the first time in recent years that Starbucks' New York locations – likely supervised by similar District Managers, Regional Managers and Human Resources personnel – have been accused of retaliating against employees for engaging in protected conduct, including not only making complaints of sexual harassment and discrimination, but also for taking leaves of absence for medical issues.

5.      For instance, in <u>Emily Feliciano v. Starbucks Corporation</u>, No. 151820/2014 (N.Y. Sup. Ct., Feb. 28, 2014), a Barista alleged that an Assistant Store Manager told her to "call him daddy," demanded sex from her, asked if he could "fuck her raw," and sexually attacked her on multiple occasions.  Ms. Feliciano alleged that after she complained about this conduct, not only was no disciplinary action taken whatsoever, but she was retaliated against when the Store Manager berated her for even mentioning the harassment or attacks.  Ms. Feliciano alleged that she was then forced to leave her job as she felt unsafe.

6.      In <u>Ginna Vasquez v. Starbucks Coffee Company</u>, 13-cv-02234 (GBD) (S.D.N.Y.,
April 4, 2013), a Barista alleged that her supervisor subjected her to a slew of offensive remarks
and propositions including, "How much do you want to go to a hotel with me?  For $50," "Will
you have sex with me?," "Yo I've wanted to smash u 4 a min.  Wanna come to my crib this
week.  I'm dead ass serious," and "I'm 100 percent serious... is that a yeah or no?  this weekend.
No strings attached."  Ms. Vasquez alleged that she complained and rejected her supervisor's
advances saying, "Why don't you just give up.  It is not going to happen."  Ms. Vazquez alleged
that her supervisor then retaliated against her by "spread[ing] rumors" that they were engaged in
sexual activities, criticizing her work, and yelling at her in front of coworkers and
customers.  Ms. Vasquez alleged that she was then forced to resign due to the sexual harassment
and resulting severe emotional distress.

7.      Furthermore, in <u>Alicia Brooks v. Starbucks Corporation</u>, 13-cv-02705 (JG)(SMG)
(E.D.N.Y., May 3, 2013), a Store Manager alleged that when she denied continuous and
harassing accusations that she was a lesbian, Starbucks employees told her, "perception is
reality," meaning that she "appears to be a lesbian and as such, must be one."  Ms. Brooks
alleged that she complained of discrimination and harassment to Human Resources, and not only
was no action ever taken against the employees, but Ms. Brooks herself was terminated in
retaliation for her protected complaints.

8.      The list goes on.  In <u>Wayne Foster v. Starbucks Corporation</u>, 12-cv-05869
(SLT)(VMS) (E.D.N.Y., Nov. 28, 2012), a Store Manager alleged that his supervisor stated that
one of his stores "[wa]s too dark" and demanded that he hire more white employees.  Mr. Foster
alleged that he refused to consider race in connection with employment decisions and his
supervisor "immediately threatened to terminate plaintiff's employment should he fail to hire

more white people." Mr. Foster alleged that he complained about this discriminatory conduct and was immediately subject to retaliation which created such stress that required him to take a medical leave of absence. Mr. Foster alleged that he was fired on the day he was expected to return from medical leave.

9.      Similarly, in Serenity Marshall v. Starbucks Corporation, 11-cv-02521 (AJN)(KNF) (S.D.N.Y., Apr. 13, 2011), a Store Manager alleged that after disclosing her serious medical condition and need for surgery to her District Manager, she was told "I would like to hold the store for you, but with how long you are going to be out, I don't know if I can." Ms. Marshall alleged that she then took an approved medical leave during which time she had surgery. After almost nine years of employment, Ms. Marshall alleged that she was not permitted to return to work following her medical leave and, similar to Mr. Foster's allegations (see paragraph 8, above), was fired without any notice on the day of her scheduled return.

10.     In Jeremiah Redmond v. Starbucks Corporation, 14-cv-01974 (PKC) (S.D.N.Y., March 20, 2014), a Store Manager alleged he was denied medical leave by his District Manager despite having a doctor's note stating that he "suffered from an acute illness and should be given a week off from work to recuperate." Mr. Redmond alleged that he took medical leave once he learned that he was entitled to it under federal law, however the District Manager continued to harass him regarding his return. Mr. Redmond alleged he then complained to Human Resources that he was being discriminated against. Then, similar to the allegations asserted by Mr. Foster and Ms. Marshall (see paragraphs 8 and 9, above), Mr. Redmond alleged he was fired on the day he was scheduled to return to work.

11.     In Jennifer Mancini v. Starbucks Coffee Company, 08-cv-09556 (LAP) (S.D.N.Y., November 6, 2008), an Account Services Manager in the New York Regional Office

alleged that a male supervisor harassed many women, including herself.  Ms. Mancini further

alleged that after she made numerous complaints against her supervisor, he retaliated by

increasing his harassing behavior and attacks.  However, Ms. Mancini alleged that Starbucks

"did nothing to stop [his] actions against [her]."  Ms. Mancini alleged that later that same year

she notified her manager that she would need a medical leave of absence.  After being employed

for Starbucks for more than three years, Ms. Mancini alleged that she was fired two days later

and was not provided any reason for her termination.

        12.     Incredibly, in addition to numerous publicly filed lawsuits in New York with

substantial similarity to this action, many Starbucks employees in New York also recently

banded together to submit an open complaint to Kalen Holmes, the former Executive Vice

President of Starbucks' Partner Resources, about Starbucks' New York leadership.  The open

complaint – which is publicly available on the internet[1] – states that former Regional Vice

President Andrew Alfano made sexual innuendos to female District Managers, told them "he

couldn't help stop the number of female customers who would come on to [him]" and let them

know, "I have a room booked for tonight in NYC."  Incredibly, although the offended group was

Starbucks' New York District Managers, the employees stated that they did not initially make a

complaint because, "unfortunately we feel the matter will not be taken seriously," and because

they feared: "speak up and risk retaliation."  The employees stated that they felt, "our

environment is unsafe."  Despite this conduct, these employees also stated that Mr. Alfano was

nonetheless "highly regarded" by senior leadership.

        13.     Moreover, as stated in the open complaint, the employees ultimately felt

compelled to come forward following a Company conference call regarding the publicity

_____

[1]       Available at: http://www.starbucksunion.org/sites/default/files/dmletter.pdf

stemming from an alarming sexual harassment case in California.  This is almost certainly a reference to the allegations of sexual abuse by a 16 year old Barista named Kati Moore in California that was widely publicized by ABC News and "20/20," among other news media.  In Jane MK Doe v. Starbucks, Inc., No. 08-cv-00582 (Cal. Superior Ct. July 6, 2007), Ms. Moore filed a detailed 45-page complaint alleging that her 24 year old supervisor wrote her text message such as: "I'd like to fuck tomorrow," "Can you deep throat it? ," "Wanna shower? ," and "I want to see you naked."  Ms. Moore alleged that she was then sexually abused and molested by her supervisor, including through the use of alcohol and drugs, which also included her supervisor videotaping the sexual escapades and showing them to other employees.  Ms. Moore alleged that her parents complained to Starbucks about this conduct, but the Company refused to take disciplinary action against the supervisor, and instead only agreed to transfer Ms. Moore to another location.  However, despite the transfer, Ms. Moore alleged that her supervisor's harassment continued unabated.

14.     These are just a small sample of the cases filed not only in New York, but around the country, where Starbucks is alleged to have refused to investigate claims of discrimination and/or retaliated against employees who have had the courage to raise complaints of sexual harassment and discrimination and/or assert their protected rights.  Ms. Wu's termination is only the latest in Starbucks' recent history of alleged unlawful, retaliatory and discriminatory conduct. Based on the striking similarities in the allegations of these actions, Starbucks appears to engage in a pattern of discriminatory and/or retaliatory conduct.

## NATURE OF THE CLAIMS

15.     Plaintiff seeks declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendant's unlawful employment practices in violation of the New York

State Human Rights Law, N.Y. Executive Law §§ 290, et seq. ("NYSHRL"), and the New York City Administrative Code §§ 8-101, et seq. ("NYCHRL").

16.    Defendant's conduct is also in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et seq. ("Title VII").  For these violations, Ms. Wu will be filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and will file an Amended Complaint following receipt of a Notice of Right to Sue.

## JURISDICTION AND VENUE

17.    The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is diversity of citizenship between Plaintiff, a resident of the State of New York, and Defendant, a corporation with its headquarters in the State of Washington, and this action involves a matter in controversy that exceeds the sum of $75,000, exclusive of interest and cost.

18.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant Starbucks Corporation is a corporation doing business in the State of New York and is subject to personal jurisdiction in this district, and a substantial part of the events or omissions giving rise to this action occurred in this district.

## PROCEDURAL REQUIREMENTS

19.    Following the commencement of this action, a copy of this Complaint will be served on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirement of § 8-502 of the New York City Administrative Code.

20.    Following the commencement of this action, Plaintiff will be filing a charge of discrimination with the EEOC.  Plaintiff will file an Amended Complaint to include claims under Title VII following receipt of a Notice of Right to Sue.

21.     Any and all other prerequisites to the filing of this suit have been met.

**PARTIES**

22.     Plaintiff Holly Wu, a former employee of Starbucks, resides in Forrest Hills, New York.  At all relevant times, Ms. Wu worked in New York City and met the definition of an "employee" under all applicable statutes throughout her employment with Defendant.

23.     Defendant Starbucks Corporation is a foreign business corporation organized and existing under the laws of the State of Washington with a principal place of business at 2401 Utah Avenue South, Seattle, Washington 98134.  Starbucks owns and operates a global chain of coffee shops comprising approximately 17,000 stores in 50 countries.  At all times relevant herein, Starbucks was and is an "employer" under all relevant statutes.

**FACTUAL ALLEGATIONS**

**Ms. Wu's Job Performance**

24.     In or around April 2012, Ms. Wu commenced her employment at Starbucks as a Barista in the Starbucks located at 450 Lexington Avenue between 44th and 45th Streets (the "Store").

25.     Ms. Wu had only recently immigrated to the United States from Taiwan in December 2011, before starting at Starbucks.

26.     Ms. Wu quickly established herself as a hardworking, conscientious and devoted employee.  Indeed, Starbucks expressly acknowledged Ms. Wu's contributions to the Store.

27.     On April 11, 2013, after Ms. Wu's first full year of employment, she received a stellar performance evaluation.  Starbucks graded Ms. Wu on a scale of 1 through 4 in nine performance categories.  Ms. Wu received a "3" – defined as "above expectations" – in eight of the nine categories and a "4" – meaning "consistently exceeds expectations" – in one category.

Moreover, the evaluation stated that "Ho Yu performs above expectations . . . has worked on developing her skills to move to the next level . . . [and] challenges herself to excel."

28.     In or around July 2013, Ms. Wu was promoted to the position of Shift Supervisor.

29.     Moreover, Ms. Wu's valuable performance at the Store was further recognized when she received three salary increases during her tenure.

30.     Further demonstrative of Ms. Wu's commitment to the Company's success, Ms. Wu took it upon herself to inform her former District Manager, Victoria Sanchez, of various problems at the Store.

31.     For instance, Ms. Wu informed Ms. Sanchez that certain Starbucks employees were acting unprofessionally around customers and that there was delayed service to customers.

32.     However, upon learning of Ms. Wu's communications with Ms. Sanchez, Store Manager Emuerald Wiggins confronted Ms. Wu, saying that she "would not be put in a situation" where Ms. Wu was complaining about her to Ms. Sanchez.

33.     When Ms. Wu said that she did not know what this meant, Ms. Wiggins threatened her, stating "if you [call Ms. Sanchez] again, you are going to understand."

34.     Ms. Wiggins then reduced Ms. Wu's hours in the following weeks.

**Sexual Harassment at the Store**

35.     As is clear, Ms. Wu was determined to succeed at Starbucks.

36.     However, Ms. Wu was shocked to enter a workplace where she was subjected to sexual harassment by her co-workers which was acquiesced to by Ms. Wiggins, Ms. Sanchez, and Ms. Sanchez's later-replacement as District Manager, Tafsir Mbodje.

37.     This sexual harassment occurred in many forms, including, but not limited to, sexual comments, physical touching, and being shown graphic sexual videos and pictures.

38.     For instance, but only by way of example, Starbucks employees commonly commented on Ms. Wu's body and referred to her using sexually-based nicknames.

39.     Certain Starbucks employees frequently commented to her that: "Your big ass looks sexy!"

40.     In addition, certain Starbucks employees referred to her as "Big Booty Holly."

41.     On one occasion, a Starbucks employee asked if Ms. Wu had been going to the gym and, pointing to her behind, said "your body can tell."

42.     Several male employees asked Ms. Wu for permission to touch her rear, which she, of course, refused.

43.     While Ms. Wu worked tirelessly to provide the highest level of customer service possible, other employees would objectify female customers, commenting on which customers had a "great ass," or "big breasts."

44.     However, the sexual harassment Ms. Wu suffered was not limited to comments and nicknames, and at times even turned physical.

45.     On one occasion, as Ms. Wu gave another employee a friendly hug, the employee moved his hands down to her behind and rubbed her rear, and then refused to remove his hands despite Ms. Wu's pleas for him to stop.

46.     Moreover, one employee in particular would "play" with Ms. Wu by pretending to open the door of the bathroom while she was inside.

47.     Ms. Wu was subject to sexual advances, even though it was well known that Ms. Wu was in a committed relationship with her boyfriend and even after she repeatedly rejected such advances.

48.     On one occasion, an employee told Ms. Wu that he wanted to have a "threesome" with her and his girlfriend.

49.     On another occasion, an employee asked Ms. Wu if he could watch Ms. Wu while she changed clothes after work.

50.     Ms. Wu, of course, flatly rejected all of these advances.

51.     One Starbucks employee in particular showed Ms. Wu sexually graphic videos and photos that were stored in a hidden cache on his cellphone.

52.     In one of the video clips, he and his girlfriend were both fully nude and engaged in sexual acts, such as Ms. Wu's co-worker licking his fingers and rubbing his girlfriend's vagina followed by the two of them having sex.

53.     Several other times, this same employee showed Ms. Wu explicit photographs of nude women with whom he claimed he had sex.

54.     Moreover, one particular Starbucks employee would tell Ms. Wu his plans for after he completed his shift, which often included sexual acts and unlawful drug activity such as:

> **I'm going to shower, relax, drink some wine, smoke some weed, fuck, and enjoy my life.**

55.     On another occasion, a Starbucks employee made Ms. Wu listen to a song with the lyrics, "pussy good, so good," and then explained to Ms. Wu that the singer had just had sex and couldn't forget the "pussy" of the woman.  Thereafter, he repeatedly sang these lyrics to Ms. Wu.

56.     In or around July 2013, a Starbucks employee began to give Ms. Wu unwanted and completely inappropriate "massages" at the Store.

57.     This employee would often follow Ms. Wu into the Store's office as Ms. Wu attempted to complete her paperwork, approach her from behind and start touching Ms. Wu's shoulders, hair, and back.

58.     While doing this, he would tell Ms. Wu, "Holly, it's okay, just relax, you look stressed."

59.     Ms. Wu was extremely uncomfortable with the way he touched her and she repeatedly asked him to stop.

60.     Rather than stop, he would try to gain Ms. Wu's consent by flirting with her and complimenting her body and appearance.

61.     Moreover, he frequently talked to Ms. Wu about women, asked her to find him a girlfriend, and even asked Ms. Wu to be his girlfriend.

62.     Ms. Wu rejected these advances, telling the employee that she was in a committed relationship with her boyfriend.

**Ms. Wu's Termination**

63.     On February 17, 2014, Ms. Wu complained in writing to the new District Manager, Mr. Mbodje, that she was being sexually harassed.

64.     Ms. Wu's sexual harassment complaint focused on the individual who had been touching her in a sexual manner without her consent.

65.     Ms. Wu's complaint explicitly stated:

> **I feel very uncomfortable when he touched my body and hair. I
> felt sexual harassment by him.**

66.     Following her complaint, Ms. Wu was never interviewed by anyone at Starbucks regarding her complaint of sexual harassment.

67.     Upon information and belief, prior to her termination, Starbucks never investigated Ms. Wu's complaint of sexual harassment.

68.     Upon information and belief, prior to her termination, Starbucks never interviewed anyone in connection with Ms. Wu's complaint of sexual harassment.

69.     Upon information and belief, prior to her termination, Ms. Wu's complaint of sexual harassment was never referred to Human Resources or Partner Resources.

70.     Starbucks has a policy prohibiting sexual harassment in the workplace.

71.     Starbucks has an internal policy requiring an "immediate, thorough and objective investigation" where the Company is made aware of a situation that may violate the policy prohibiting sexual harassment.

72.     Ms. Wu's complaint was a complaint of sexual harassment as that term is understood under Starbucks policy.

73.     Starbucks did not engage in an "immediate, thorough and objective investigation" regarding Ms. Wu's complaints of sexual harassment.

74.     On or about March 13, 2014, Ms. Wu was fired.

75.     Despite her excellent performance appraisals, promotion to Shift Supervisor, and multiple raises, Ms. Wu was fired only approximately three weeks after she complained of sexual harassment.

**Pattern of Unlawful Conduct at Starbucks**

76.     As set forth in the Preliminary Statement, and upon information and belief, Starbucks' New York leadership appears to engage in what appears to be a pattern of unlawful discriminatory and retaliatory conduct towards its employees.

77.     Moreover, upon information and belief, Starbucks' New York leadership appears to engage in a pattern of conduct whereby it fails to investigate and/or remedy complaints of unlawful discriminatory and retaliatory conduct towards its employees.

78.     Upon information and belief, the conduct to which Ms. Wu has been subjected, and Starbucks' refusal to investigate her complaint and/or take any remedial or disciplinary action, is not an isolated occurrence or mere anomaly.  Rather, upon information and belief, it is the predictable result of the Company's institutional practices.

### FIRST CAUSE OF ACTION
**(Sexual Harassment and Gender Discrimination Under the NYSHRL)**

79.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

80.     Defendant has discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by subjecting Plaintiff to disparate treatment based upon her gender including, but not limited to, subjecting her to sexual harassment and a hostile work environment and refusing to investigate her complaints of sexual harassment and discrimination.

81.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

82.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for this she is entitled to an award of monetary damages and other relief.

83.     Defendant's unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)

84.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

85.     By the actions described above, among others, Defendant retaliated against Plaintiff on the basis of her protected activities in violation of the NYSHRL by not engaging in any investigation of her complaints and ultimately terminating her employment.

86.     As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of monetary damages and other relief.

87.     As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

## THIRD CAUSE OF ACTION
### (Sexual Harassment and Gender Discrimination Under the NYCHRL)

88.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

89.     Defendant has discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL by subjecting Plaintiff to disparate treatment based upon her gender

including, but not limited to, subjecting her to sexual harassment and a hostile work environment and refusing to investigate her complaints of sexual harassment and discrimination.

90.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

91.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for this she is entitled to an award of monetary damages and other relief.

92.     Defendant's unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

### FOURTH CAUSE OF ACTION
### (Retaliation in Violation of the NYCHRL)

93.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

94.     By the actions described above, among others, Defendant retaliated against Plaintiff on the basis of her protected activities in violation of the NYCHRL by not engaging in any investigation of her complaints and ultimately terminating her employment.

95.     As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of monetary damages and other relief.

96.     As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendant, containing the following relief:

A.     A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States and the State of New York;

B.     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

C.     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her mental anguish and emotional distress, humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical and mental injuries;

D.     An award of damages to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputations and loss of career fulfillment;

E.     An award of punitive damages;

F.     An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and,

G.      Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: May 28, 2014
       New York, NY

Respectfully submitted,

WIGDOR LLP

By: _____
       David E. Gottlieb
       Matthew R. Pisciotta

85 Fifth Avenue
New York, NY 10003
Telephone:  (212) 257-6800
Facsimile:  (212) 257-6845
dgottlieb@wigdorlaw.com
mpisciotta@wigdorlaw.com

*Counsel for Plaintiff*